## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **MICHAEL BRADY LESTER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 7:20cv00160** |
| **v.** | ) | |
| | ) | <u>**MEMORANDUM OPINION**</u> |
| **SOUTHWEST VIRGINIA** | ) | |
| **REGIONAL JAIL AUTHORITY, et** | ) | **By: Pamela Meade Sargent** |
| **al.,** | ) | **United States Magistrate Judge** |
| **Defendants** | ) | |

Plaintiff, Michael Brady Lester, ("Lester"), a prisoner previously incarcerated at the Southwest Virginia Regional Jail Authority's facility in Abingdon, has filed this civil rights action pursuant to 42 U.S.C. §1983, against the Southwest Virginia Regional Jail Authority, ("Jail"), Stephen Clear, ("Clear"), and Chad Kilgore, ("Kilgore"), alleging that his First and Fourteenth Amendment rights under the U.S. Constitution were violated. This case is before the court on the defendants' Motion To Dismiss, (Docket Item No. 15), and Plaintiff's Motion For Preliminary Injunctive Relief, (Docket Item No. 14). For the reasons stated below, the Motion To Dismiss will be granted in part and denied in part, and the Motion For Injunctive Relief will be denied.

*I. Facts*

In his Amended Complaint, (Docket Item No. 30-1) ("Amended Complaint"),[1] Lester seeks a declaratory judgment, injunctive relief and nominal, compensatory and punitive damages, alleging that the defendants violated his rights under the First and Fourteenth Amendments. Lester stated that the Jail and its employees were unconstitutionally censoring publications and mail in violation of his rights to due process and to freely exercise his religion. Lester stated that the Jail implemented a policy starting March 1, 2015, no longer allowing inmates to receive personal materials from outside publishers. According to Clear, the Jail's Superintendent, the Jail implemented the policy because of inappropriate material, a lack of space in the property room and safety concerns such as preventing fire hazards. The Jail amended this policy on June 1, 2016, to allow inmates to order books from an outside publishing company on a case-by-case basis with the approval of the Jail Administrator, Kilgore, or his designee. Lester also alleged that Clear, in another case in this court, stated that the Jail accepted, upon approval, donations to the library.

Lester stated he was incarcerated at the Jail at the time of the filing of his Amended Complaint and "may spend years in the Jail's facility." (Amended Complaint at 2.)[2] He stated that, at some unspecified time, he requested the Jail's operating procedures "regarding purchase of any publications, criteria to such,

---

[1] Lester's Amended Complaint was amended as set out in Docket Item No. 39-1 to add the words "and the Fourteenth Amendment" to Lester's request for declaratory relief finding that the defendants' policies and practices violated the First Amendment.

[2] By letter dated January 28, 2021, Lester notified the court that he had been transferred to Virginia Department of Corrections, ("VDOC"), custody at Nottoway Correctional Center. (Docket Item No. 44.)

rejected/censored publication list, preapproved publication vendors, and the process available … to challenge a rejected/censored publication." (Amended Complaint at 2.) In response, Lester stated, he was informed that staff had exercised discretion to withhold these records from him. Lester stated that he had limited access to "the Qabalah[3] (practice central to Lester's religious beliefs) and other things that interest him such as magazines about home theater products." (Amended Complaint at 2.) Lester said that he had infrequent access to the Jail's "book room" containing old and worn out books and one copy of a local, weekly newspaper and one copy of a national newspaper, which were shared by 70 other inmates. Lester said he could request books from the book room, but his requests were rarely granted. He said he was not allowed to visit the book room and was not provided a list of books in the book room. Lester said that he contacted the Jail's Chaplain, as well as the book room, seeking any book about Qabalah "to no avail." (Amended Complaint at 2.)

Lester said, on January 13, 2020, he received an "Inmate Mail Notice Form" telling him a book purchased by his mother from Amazon about Qabalah had been confiscated/seized.  He said the only reason given was "'rejected book per Major Kilgore." (Amended Complaint at 2.) He said that he "was not given a process to challenge the censorship." (Amended Complaint at 2.) Lester said that he wrote to Clear and Kilgore, as instructed by the Jail's security staff, on January 14, 2020, expressing his concerns about the "censored book." (Amended Complaint at 2.) He said that he told Clear and Kilgore that they gave him no reason for the action and offered him no avenue to challenge the censorship. He said that he further told Clear and Kilgore that the rejected book was a religious text on Qabalah, that Qabalah was

---

[3] Qabalah, also spelled Kabbalah and Cabala, is the ancient Jewish tradition of mystic interpretation of the Hebrew Scriptures. *See* WEBSTER'S II NEW COLLEGE DICTIONARY (2001) at 152-53.

central to his religious belief, and he asked why their policies would reject any text that helped him become closer to God. Lester said he also told Clear and Kilgore that the book policy was not posted at the Jail, and "there [was] confusion about Kilgore's procedure change…." (Amended Complaint at 7.) Lester alleged that he was told through the Jail's grievance procedure "Clear and Major Kilgore are not part of the request module. In order to ask them a question directly … it will require mailing them a letter." (Amended Complaint at 7.) Neither Clear nor Kilgore answered Lester's letter.

Lester said he subsequently wrote Clear, Kilgore and "other Jail staff" several more letters about them declining to reply to his letter about censorship, issues of Jail staff's handling his grievances and asking why the Jail's publication policy was withheld from him, "[a]gain, to no avail." (Amended Complaint at 2-3.) On February 11, 2020, Lester mailed another letter to Clear, Kilgore and "other Jail staff" revisiting his concerns about the censored publication and the unavailable publications policy. In this letter, Lester requested permission to subscribe to a magazine about home theater products, *Sound and Vision*. Lester's letter explained that he had been allowed to have the magazine while he was incarcerated in the VDOC and that the magazine posed no security threat. He said that he explained that he should be allowed to subscribe to this magazine because the Jail allowed inmates to subscribe to *Prison Legal News* and *Criminal Legal News*, both of which were magazines. Lester said that Kilgore replied, "[t]he book is not considered Legal, Religious, or Educational with workbooks involved to further your education. … [y]ou can receive the types of reading material that you are now requesting from our bookroom." (Amended Complaint at 3.) Lester stated that magazines were not provided by the book room, and they did not have materials on home theater products.

-4-

Lester said that, on April 27, 2020, he received two more Inmate Notice Forms stating "[r]ejected] [l]etters." (Amended Complaint at 3.) These letters were from his mother and contained the VDOC's Operating Procedures regarding incoming publications. Lester said that these Operating Procedures posed no security threat to the Jail. He said he was not given a reason for why these letters were rejected, and he was not given a process to challenge the censorship. Lester said that, on May 15, 2020, he received another Inmate Notice Form stating "[r]ejected [l]etters with pamphlets." (Amended Complaint at 3.) The rejected letter was from the Theosophical Society. He said he was given no other reason for the censorship and no process to challenge the censorship. Lester said, a month earlier, several other inmates in his living area had received color pamphlets from the Society (Quest Journal of the Theosophical Society in America # ISSN-1040-533X). (Amended Complaint at 3.)

Lester stated that "the Defendant's [sic] policies invite arbitrary decisions that are pushed by Defendant's [sic] biases and do not bear a rational relationship to the legitimate penological interest." (Amended Complaint at 3, 8.) He further stated, "Defendants acted with the intent to injure, vex, annoy, and harass … and subjected him to cruel and unjust hardship in conscious disregard of his rights with the intention of causing … injury and depriving him of constitutional rights." (Amended Complaint at 4.)

Lester alleged that Lucas Davis received a December 23, 2019, letter from Kilgore that stated "[t]he books you request will come in and if there are no security issues, then you will be allowed to have them. Your cell will be searched to make sure you only have the allotted number you can have, which is 5." (Amended Complaint at 6.) Lester said the letter made no mention of a lack of space in the

property room or of fire hazards. Lester alleged that "the Defendants cannot assert they do not have the staff to deal with the influx of publications because they do have the staff to search cells to make sure inmates have no more than the allotted number of books." (Amended Complaint at 6.)

Lester alleged that Michael Barrett received a letter from Kilgore on January 16, 2020, stating that a book ordered from Amazon was "censored" because it contained too much color and could have been used to hide drugs among other things. (Amended Complaint at 6.) Lester said that Jail inmates are allowed to have 10 full-color photographs mailed in by their family and friends.

Lester alleges that, to the date of the filing of his Amended Complaint, he did not know what the Jail's policies were. Specifically, he stated that he did not know what the criteria for ordering books were, what was considered a security issue, whether censored books were returned immediately and which books would be censored if purchased. (Amended Complaint at 7.)

Lester further alleged:

> Obtaining reading material in the Jail is a frustrating process. Every two weeks Lester has to put in for a library slip to request books from the bookroom. Usually the books he receives are old and worn out. These books normally have missing pages and are rarely the books he requested or even the types he requested. The Defendants may state that his family may donate books to the Jail, but there is no guarantee he will receive them.

(Amended Complaint at 8.) Lester further alleged that the defendants cannot show there is a reasonably related, legitimate penological interest for this policy.

-6-

Lester stated that the book on the Qabalah, which he was not allowed to receive, would have instructed him "in the mystical practice he believes is central to an esoteric form of Judeo-Christianity he practices." (Amended Complaint at 9.) Lester stated:

> For centuries, Judaic and Christian mystics have written a plethora of Qabalistic materials, one leading to another as there is no single authority on the subject. The Qabalah/Cabala/Kabbalalah teaches among other things, a meditative state designed to give the seeker a direct divine communication with God. The way Qabalah suggest the seeker (Lester) to do this is through acts of harmony with the universe and higher awareness. One aspect is through the Tree of Life, a tool that enables us to explore all aspects of our inner and outer selves.

(Amended Complaint at 9.) Lester alleged that the material contained in the book he was not allowed was the only source he had for religious instruction. As a result of the defendants' policies and actions, Lester said, they have forced him to abandon one of the precepts of his religious beliefs. Lester said that the defendants offered him no alternative means to obtain Qabalah books for his religious instruction. He said that he had exhausted all available avenues at the Jail to obtain information about Qabalah practices. Lester alleged that the Jail's regulation placed a substantial burden on the free exercise of his religion, an exercise that he believes is essential for his salvation. Lester alleged that the defendants' actions violated his due process rights and prohibited the free exercise of his religious beliefs.

Lester alleged that the Jail generally rejects publications mailed to its inmates, except for those offered by the Human Rights Defense Center, ever though Clear knew that at least a dozen other jails in Virginia permitted their inmates to order

books and magazines. Lester alleged that thousands of correctional facilities in the United States allow incarcerated persons access to books and magazines. Lester alleged that he never observed Jail staff enforcing a maximum for the publications that were allowed to be sent to inmates. He also stated that there was no limit on the amount of legal papers an inmate could have in his cell, and he never saw Jail staff enforce any limit on the amount of legal papers an inmate could have in his cell. Lester alleged that it would be easier for Jail staff to provide mail and publications such as magazines to the inmates than to confiscate them. He stated that the defendants' policy was an exaggerated response to prison concerns.

Lester alleged that the Jail is a "municipality, a unit of local government organized and existing under the laws of the Commonwealth of Virginia." He said that the Jail operated four "detention facilities in Virginia, in the cities of Abingdon, Duffield, Haysi, and Tazewell…." (Amended Complaint at 5.) He said the Jail was responsible for adopting and implementing mail policies and publication policies for the inmates for the four facilities. Lester alleged that Clear is the Superintendent of the Jail and is employed by and is an agent of the Jail.  He alleged that Clear is responsible for overseeing the management and operations of the Jail's facilities and for hiring screening, training, retention, supervision, discipline and controlling the personnel of the Jail's facilities who interpret and apply the mail policy and publication policy. As Superintendent, Lester alleged, Clear is the final policy maker for the Jail with respect to the operations of all the Jail's facilities, including the policies governing incoming mail and publications for inmates.

Lester alleged that Kilgore is the Major, the Jail Administrator of the Jail's Abingdon facility, and is employed by and is an agent of the Jail.  Lester alleged that Kilgore is the Chief of Security and is responsible for reviewing, allowing or

disallowing incoming mail and publications to inmates. He alleged that Kilgore's review is final, and there is no disinterested party above him to which to appeal Kilgore's "censorship decisions." (Amended Complaint at 5.)

Clear and Kilgore are sued in their individual and official capacities. Lester alleges that the actions of the defendants were taken under the authority and color of state law. He alleged that the defendants' actions were motivated by malicious intent and were committed under color of state law with reckless indifference to his rights. He alleged that the defendants' conduct was objectively unreasonable and undertaken recklessly, intentionally, willfully and with malice and deliberate indifference to Lester's rights. Lester alleged that the defendants were personally responsible for creating and implementing the unconstitutional policies and for training and supervising employees whose conduct injured Lester. Lester alleged that the defendants' unconstitutional policies and practices were causing him irreparable harm and that he had no adequate remedy at law. He stated that he had exhausted all administrative remedies that were available to him. He stated that there was no grievance process at the Jail to allow him to access an official to review or override Kilgore's "censorship." (Amended Complaint at 12.) He alleged that Kilgore's review was final with no process for Lester to seek review through the Jail's grievance procedure.

Lester alleged that the defendants' policy and actions violated his right to due process under the Fourteenth Amendment, in that he did not receive adequate notice and an opportunity to object to or appeal the defendants' decision to censor and prevent mail and publications from reaching him. Lester also alleged that the defendants' acts violated his right to freely exercise his religious beliefs under the First Amendment. In particular, Lester said that there was no reasonable, legitimate

penological interest to censor a book about Qabalah, a religious practice that he held as a sincere belief. He said that the defendants' policies place a substantial burden on his ability to freely exercise his religious beliefs and that they offered him no alternative means to obtain such publications.

Lester seeks declaratory and injunctive relief and nominal, compensatory and punitive damages.

## II. Analysis

In the Motion To Dismiss, the defendants argue that Lester's Amended Complaint should be dismissed under Federal Rules of Civil Procedure Rule 12(b)(6) for failing to state a claim upon which relief may be granted. The defendants also argue that Lester's claims against Clear and Kilgore for money damages are barred by the doctrine of qualified immunity. The defendants further argue that Lester's claims against the Jail for all relief other than injunctive relief are barred by the Eleventh Amendment. Finally, the defendants argue that Lester cannot recover money damages from Clear and Kilgore in their official capacity under § 1983.

A motion to dismiss under Rule 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and it must allege facts specific enough to raise a right to relief above the speculative level.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  Dismissal also may be appropriate where the complaint contains a detailed description of underlying facts, which fail to state a viable claim. *See Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976).

Furthermore, the court is required to liberally construe complaints filed by plaintiffs proceeding pro se. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pro se complaints are held to a less stringent standard than those drafted by attorneys. *See Erickson,* 551 U.S. at 94; *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). This requirement of liberal construction does not mean, however, that the court should ignore a clear failure to plead facts which set forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

In this case, Lester claims that his First  and Fourteenth Amendment rights to freely exercise his religion and to due process were violated by the defendants' policy, implemented starting March 1, 2015, that no longer allowed Jail inmates to receive personal materials from outside publishers.  In particular, Lester claims that his right to freely exercise his religion was violated by Kilgore's decision to reject his access to a book about Qabalah. Lester alleged that the book was confiscated/seized by Jail staff on January 13, 2020, and he received an "Inmate Mail Notice Form" telling him only that he had received a "rejected book per Major Kilgore." Lester also claims that his request to receive a subscription to a magazine about home theater products, *Sound and Vision*, was denied by Kilgore, who stated only, "[t]he book is not considered Legal, Religious, or Educational with workbooks involved to further your education. … [y]ou can receive the types of reading material that you are now requesting from our bookroom." (Amended Complaint at 3.) Lester alleged that, on April 27, 2020, he received two more Inmate Notice Forms stating

"[r]ejected] [l]etters" for letters from his mother that contained the VDOC's Operating Procedures regarding incoming publications. Lester also alleged that, on May 15, 2020, he received another Inmate Notice Form stating "[r]ejected [l]etters with pamphlets." The rejected letter was from the Theosophical Society.

In each of these instances, Lester alleged, he was given no further information as to why the particular publication or letter was rejected. Lester alleged that the Jail's publication policy was not posted at the facility or provided to inmates. He further alleged that he had requested a copy of the policy, but it was never provided to him. He said that Jail staff orally provided different versions of the policy to inmates. He also alleged that the policy did not provide any avenue for the review of a decision to reject a publication or letter by someone not involved in the decision.

I first will address Lester's claim that the Jail's publication/mail policy violated his due process rights under the Fourteenth amendment. The Supreme Court has recognized that the interest of prisoners and their correspondents in uncensored communication by mail is a liberty interest within the meaning of the Fourteenth Amendment. *See Procunier v Martinez*, 416 U.S. 396, 418 (1974).  Courts have held that due process requires the following minimal safeguards for the withholding of a prisoner's incoming mail or publications: "(1) appropriate notice; (2) a reasonable opportunity to challenge the initial determination; and (3) an ultimate decision by a disinterested party not privy to the initial censorship determination." *Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977) (citing *Procunier*, 416 U.S. at 418-19). The third safeguard is met if complaints about the withholding of incoming mail are "referred to a prison official other than the person who originally disapproved the correspondence." *Hopkins*, 548 F.2d at 504.

Accepting the facts as alleged by Lester, I find that he has sufficiently pleaded a claim for violation of his due process rights. While the facts alleged by Lester show that he received notice of each item of mail withheld, he also alleged that he had no reasonable opportunity to challenge the initial determination because he was not provided with accurate information about the policy or any appeal right he might have had under the policy. Lester also alleged that the policy was not posted at the Jail and that he could not obtain a copy of the policy. Further, Lester alleged that, when he inquired about his appeal rights, Jail staff informed him to write Kilgore, the very person who appeared to be making the initial decision to withhold his publications and mail. Lester also has alleged sufficient facts from which a jury could find that both Clear and Kilgore were actively involved in the adoption and implementation of the Jail's publication/mail policy.

Turning to Lester's First Amendment claim, I note that Lester does not allege the publication/mail policy violated his free speech rights. Instead, Lester claims that the application of the policy to prevent him from receiving a book about Qabalah violated his First Amendment right to freely exercise his religion. To adequately plead a free exercise claim, a prisoner must allege that "(1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017). "… [A] 'substantial burden' is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate is beliefs,'… or one that forces a person to 'choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion … on the other hand.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (internal citations omitted). When deciding whether the prison's practice substantially burdens a religious exercise, "courts must not judge the significance of

-13-

the particular belief or practice in question." *Lovelace*, 472 F.3d at 187 n.2. At the pleading stage, a prisoner's allegation that his religious beliefs require a particular practice, participation or ritual that prison officials have not allowed is sufficient to plead the substantial burden element of a First Amendment free exercise claim. *See Wilcox*, 877 F.3d at 168.  If a prisoner sufficiently alleges a substantial burden on his ability to practice his religion, then the court must consider whether the practice or policy "is reasonably related to [a] legitimate penological interest[]" such as security, discipline or efficient use of limited resources. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987).

In this case, Lester has alleged that, while incarcerated at the Jail, he had limited access to "the Qabalah," a practice that Lester twice alleged in his Amended Complaint was "central" to his religious beliefs. Lester also alleged that he contacted the Jail's Chaplain, as well as the book room, seeking any book about Qabalah "to no avail." Lester alleged that he was denied access to a religious text on Qabalah that was sent to him at the Jail under the Jail's publication policy. Lester stated that the book on Qabalah, which he was not allowed to receive, would have instructed him "in the mystical practice he believes is central to an esoteric form of Judeo-Christianity he practices." Lester also stated:

> For centuries, Judaic and Christian mystics have written a plethora of Qabalistic materials, one leading to another as there is no single authority on the subject. The Qabalah/Cabala/Kabbalalah teaches among other things, a meditative state designed to give the seeker a direct divine communication with God. The way Qabalah suggest the seeker (Lester) to do this is through acts of harmony with the universe and higher awareness. One aspect is through the Tree of Life, a tool that enables us to explore all aspects of our inner and outer selves.

Lester alleged that the material contained in the book he was not allowed was the only source he had for religious instruction on the Qabalah. As a result of the defendants' policies and actions, Lester said, they have forced him to abandon one of the precepts of his religious beliefs. Lester said that the defendants offered him no alternative means to obtain Qabalah books for his religious instruction, and he had exhausted all available avenues at the Jail to obtain information about Qabalah practices. Lester alleged that the prison regulation placed a substantial burden on the free exercise of his religion, an exercise that he believes is essential for his salvation.

Based on these facts, I find that Lester has adequately pleaded that practicing Qabalah is required by his religious beliefs, and the Jail's publication policy prevented him from learning about Qabalah and how to practice it, placing a substantial burden on the free exercise of his religious beliefs. Having found that Lester has adequately pleaded that the Jail's publication policy violated his right to freely exercise his religious beliefs, I, now, must consider whether Lester has adequately pleaded that the policy is not reasonably related to a legitimate penological interest.

In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. To meet this standard, the Court identified four factors to consider: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on guards and other prisoners and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison

officials. *See Turner*, 482 U.S. at 89-90. The Fourth Circuit has recognized that "[p]rison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999) (internal quotation omitted).  Furthermore, "[t]he burden … is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In his Amended Complaint, Lester alleged that the defendants cannot show there is a reasonably related, legitimate penological interest for this policy. More specifically, Lester alleged, according to Clear, the Jail implemented the publication policy because of inappropriate material, a lack of space in the property room and safety concerns such as preventing fire hazards. With regard to preventing a fire hazard, Lester alleged that Kilgore, in a letter to another Jail inmate, admitted that there was adequate staff at the Jail to search cells to ensure that the inmates did not possess more than an allotted number of books. Lester further alleged that this showed that the Jail had adequate staff to deal with publications sent to inmates. He also alleged that there was no Jail policy that limited the amount of legal papers an inmate could have in his cell, and he never saw Jail staff enforce any limit on the amount of legal papers an inmate could have in his cell. Lester also alleged that it would be easier for Jail staff to provide mail and publications such as magazines to the inmates than to confiscate them. He stated that the defendants' policy was an exaggerated response to prison concerns.

While it will be Lester's burden at trial to disprove the validity of the Jail's policy, *see Overton*, 539 U.S. at  132, at this stage, he is only responsible for pleading

sufficient facts from which it could be found that the policy is not reasonably related to a legitimate penological interest.  I find that the facts alleged by Lester in his Amended Complaint are sufficient.

The defendants correctly argue that the Jail and defendants Clear and Kilgore in their official capacities are not liable for monetary damages under § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (state agency and employees sued in official capacity are not "persons" for purposes of § 1983). Therefore, I will grant the Motion To Dismiss, insofar as to dismiss Lester's claims for monetary damages against the Jail and Clear and Kilgore their official capacities.

The defendants also argue that defendants Clear and Kilgore are protected from Lester's claim for damages in their individual capacities by the doctrine of qualified immunity.  Qualified immunity "shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)). A claim of qualified immunity is evaluated using a three-step analysis.  *See Hope v. Pelzer*, 536 U.S. 730, 736-39 (2002); *see also Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). First, the court must determine whether plaintiff's allegations, if true, establish a constitutional violation.[4] *See Saucier*, 533 U.S. at 201.

---

[4] In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that the sequential inquiry of *Saucier* is often appropriate, but not mandatory.  Instead, the Court held that the judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *See Pearson*, 555 U.S. at 236.

Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998. A defendant asserting qualified immunity has the burden of proving the defense. *See Meyers v. Baltimore Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013).

In particular, the defendants argue that Clear and Kilgore could not have known that the actions they took pursuant to the Jail's publication/mail policy violated Lester's constitutional rights because the right violated was not clearly established based on the previous decisions of this court. In *Hardoby v. Sw. Va. Reg'l Jail Auth.*, 2017 WL 2684097, at *2-3 (W.D. Va. June 21, 2017), the undersigned upheld the Jail's policy that prevented an inmate from receiving a subscription to a daily newspaper.  That decision, however, was made at the summary judgment stage upon undisputed evidence offered by the defendant that the policy promoted the legitimate penological interests of maintaining institutional security and preserving internal order, in that the Jail did not have adequate staff to deliver newspapers to inmates daily.  *See Hardoby*, 2017 WL 2684097, at *3. In *Hardoby*, at the time of the undersigned's decision, the only claim remaining before the court was a First Amendment free speech claim. *See Hardoby*, 2017 WL 2684097, at *1. In *Lester v. Clear,* No. 7:15cv356, this court summarily dismissed a claim by this same plaintiff alleging the Jail's "no outside publications" policy violated his rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments. The court's ruling in that case, however, was based on the plaintiff's failure to allege facts sufficient to state a claim. *See Lester,* No. 7:15cv356, slip opinion at *2-3 (W.D. Va. Aug. 4, 2015).

-18-

In this case, Lester's First Amendment claim is not based on his free speech rights, but on his right to freely exercise his religion. The right of prisoners to be free from prison actions that place a substantial burden on the free exercise of their religious beliefs is well-established. *See O'Lone*, 482 U.S. at 348-49. In this case, Lester also raises a claim that the publication/mail policy violated his due process rights under the Fourteenth Amendment. Lester alleged that the events giving rise to his due process claim occurred from January to April 2020. On June 5, 2019, this court held that defendant Clear was not protected by the doctrine of qualified immunity from a claim for damages under § 1983 on a claim that the Jail's publication policy violated the plaintiff's due process rights. *See Human Rights Def. Ctr. v. Sw. Va. Reg'l Jail Auth.*, No. 1:18cv13, slip op. at *37-38 (W.D. Va. June 5, 2019). The court's decision in that case cited *Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 107 (4th Cir. 1996), which recognized that prison authorities' decisions to withhold inmate mail must provide minimum procedural safeguards to inmates. Therefore, both these rights were clearly established at the time of the defendants' alleged actions. On this basis, I will deny the Motion To Dismiss, at this stage, insofar as it argues that the defendants' actions were protected by the doctrine of qualified immunity.

I also will deny the Motion To Dismiss insofar as it argues that Lester has not alleged sufficient facts showing Clear's involvement in the violation of his due process rights. Lester's Amended Complaint alleged that Clear, as Jail Superintendent, was responsible for the adoption and implementation of all Jail policies, including the Jail's publication/mail policy. Insofar as Lester's Amended Complaint alleges that the Jail's publication/mail policy, on its face, violates his constitutional rights, he has sufficiently alleged Clear's personal involvement. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (liability under § 1983 lies only

where it is shown that official acted personally in deprivation of the plaintiff's rights).

Insofar as Lester seeks preliminary injunctive relief, that motion will be denied as moot, in that Lester no longer is an inmate at the Jail. *See Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) (preliminary injunctive relief is intended to prevent harm or further harm to the movant during pendency of legal proceedings); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (movant must show he will suffer irreparable harm in absence of preliminary relief).

An appropriate Order will be entered.

**ENTERED**: March 2, 2021.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE