## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **MICHAEL BRADY LESTER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 7:20cv00160** |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **SOUTHWEST VIRGINIA** | ) | |
| **REGIONAL JAIL AUTHORITY, et** | ) | **By: Pamela Meade Sargent** |
| **al.,** | ) | **United States Magistrate Judge** |
| **Defendants** | ) | |

Plaintiff, Michael Brady Lester, ("Lester"), a prisoner previously incarcerated at the Southwest Virginia Regional Jail Authority's facility in Abingdon, has filed this civil rights action pursuant to 42 U.S.C. §1983, against the Southwest Virginia Regional Jail Authority, ("Jail"), Stephen Clear, ("Clear"), and Chad Kilgore, ("Kilgore"), alleging that his First and Fourteenth Amendment rights under the U.S. Constitution were violated. This case is before the court on the defendants' Motion For Summary Judgment, etc., (Docket Item No. 84), ("Motion"). For the reasons stated below, the Motion will be granted.

## I. Facts

In his Second Amended Complaint, (Docket Item No. 51) ("Amended Complaint"), which was made under penalty of perjury, Lester alleged that the defendants violated his rights under the First and Fourteenth Amendments. Lester stated that the Jail and its employees were unconstitutionally censoring publications

and mail in violation of his rights to due process, to free speech[1] and to freely exercise his religion. Lester stated that the Jail implemented a policy starting March 1, 2015, no longer allowing inmates to receive personal materials from outside publishers. According to Clear, the Jail's Superintendent, the Jail implemented the policy because of inappropriate material, a lack of space in the property room and safety concerns such as preventing fire hazards. The Jail amended this policy on June 1, 2016, to allow inmates to order books from an outside publishing company on a case-by-case basis with the approval of the Jail Administrator, Kilgore, or his designee. Lester also alleged that Clear, in another case in this court, stated that the Jail accepted, upon approval, donations to the library.

Lester stated he was incarcerated at the Jail at the time of the filing of his Amended Complaint. (Amended Complaint at 2.)[2] He stated that, at some unspecified time, he requested the Jail's operating procedures "regarding purchase of any publications, criteria to such, rejected/censored publication list, preapproved publication vendors, and the process available … to challenge a rejected/censored publication." (Amended Complaint at 2.) In response, Lester stated, he was informed that staff had exercised discretion to withhold these records from him. Lester stated that he had limited access to "the Qabalah[3] (practice central to Lester's religious beliefs) and other things that interest him such as magazines about home theater products." (Amended Complaint at 2.) Lester said that he had infrequent access to the Jail's "book room" containing old and worn out books and one copy of a local,

---

[1] By Order entered on April 9, 2021, Lester's Amended Complaint was amended as set out in Docket Item No. 59 to add that the defendants' action violated his free speech rights under the First Amendment.

[2] By letter dated March 15, 2021, Lester notified the court that he had been transferred to Virginia Department of Corrections, ("VDOC"), custody at Dillwyn Correctional Center. (Docket Item No. 53.)

[3] Qabalah, also spelled Kabbalah and Cabala, is the ancient Jewish tradition of mystic interpretation of the Hebrew Scriptures. See WEBSTER'S II NEW COLLEGE DICTIONARY, 152-53 (2001).

weekly newspaper and one copy of a national newspaper, which were shared by 70 other inmates. Lester said he could request books from the book room, but his requests were rarely granted. He said he was not allowed to visit the book room and was not provided a list of books in the book room. Lester said that he contacted the Jail's Chaplain, as well as the book room, seeking any book about Qabalah "to no avail." (Amended Complaint at 2.)

Lester said, on January 13, 2020, he received an "Inmate Mail Notice Form" telling him a book purchased by his mother from Amazon about Qabalah had been confiscated/seized.  He said the only reason given was "'rejected book per Major Kilgore." (Amended Complaint at 2, 7.) He said that he "was not given a process to challenge the censorship." (Amended Complaint at 2, 7.) Lester said that he wrote to Clear and Kilgore, as instructed by the Jail's security staff, on January 14, 2020, expressing his concerns about the "censored book." (Amended Complaint at 2, 7.) He said that he told Clear and Kilgore that they gave him no reason for the action and offered him no avenue to challenge the censorship. He said that he further told Clear and Kilgore that the rejected book was a religious text on Qabalah, that Qabalah was central to his religious belief, and he asked why their policies would reject any text that helped him become closer to God. Lester said he also told Clear and Kilgore that the book policy was not posted at the Jail, and "there [was] confusion about Kilgore's procedure change…." (Amended Complaint at 7.) Lester alleged that he was told through the Jail's grievance procedure "Clear and Major Kilgore are not part of the request module. In order to ask them a question directly … it will require mailing them a letter." (Amended Complaint at 7.) Neither Clear nor Kilgore answered Lester's letter.

Lester said he subsequently wrote Clear and Kilgore several more letters about the above and asking why staff under their control were denying him mail and book

policies. (Amended Complaint at 7.) Lester said that neither defendant replied, and he still did not know what the Jail's policies were. (Amended Complaint at 7.) Lester said that he did not know what the criteria for ordering books were, what was considered a "security issue," whether censored books were returned immediately so he could challenge the action or which books would be censored. (Amended Complaint at 7.)

On February 6, 2020, Lester mailed another letter to Clear and Kilgore seeking permission to subscribe to a magazine about home theater products, *Sound and Vision*. Lester's letter explained that he had been allowed to have the magazine while he was incarcerated in the VDOC and that the magazine posed no security threat. He said that he explained that he should be allowed to subscribe to this magazine because the Jail allowed inmates to subscribe to *Prison Legal News*, ("PLN"), and *Criminal Legal News*, ("CLN"), both of which were magazines.  Lester said that, on February 18, 2020, Kilgore replied, "the book is not considered Legal, Religious, or Educational with workbooks involved to further your education. … [y]ou can receive the types of reading material that you are now requesting from our bookroom." (Amended Complaint at 7-8.) Lester stated that magazines were not provided by the book room, and they did not have "the types of reading material" that he was requesting. (Amended Complaint at 8.)

Lester said that, on April 27, 2020, he received two more Inmate Notice Forms stating "[r]ejected [l]etters." (Amended Complaint at 8.) These letters were from his mother and contained the VDOC's Operating Procedures regarding incoming publications. Lester said that these Operating Procedures posed no security threat to the Jail. He said he was not given a reason for why these letters were rejected, and he was not given a process to challenge the censorship. Lester said that, on May 15, 2020, he received another Inmate Notice Form stating "[r]ejected [l]etters with

-4-

pamphlets." (Amended Complaint at 8.) The rejected letter was from the Theosophical Society. He said he was given no other reason for the censorship and no process to challenge the censorship. Lester said, a month earlier, several other inmates in his living area had received color pamphlets from the Society (Quest Journal of the Theosophical Society in America # ISSN-1040-533X). (Amended Complaint at 8.)

Lester stated that "the Defendant's [sic] policies invite arbitrary decisions that are pushed by Defendant's [sic] biases and do not bear a rational relationship to the legitimate penological interest." (Amended Complaint at 8.) He further stated, "Defendants acted with the intent to injure, vex, annoy, and harass … and subjected him to cruel and unjust hardship in conscious disregard of his rights with the intention of causing … injury and depriving him of constitutional rights." (Amended Complaint at 4.)

Lester alleged that Lucas Davis received a December 23, 2019, letter from Kilgore that stated "[t]he books you request will come in and if there are no security issues, then you will be allowed to have them. Your cell will be searched to make sure you only have the allotted number you can have, which is 5." (Amended Complaint at 6.) Lester said the letter made no mention of a lack of space in the property room or of fire hazards. Lester alleged that "the Defendants cannot assert they do not have the staff to deal with the influx of publications because they do have the staff to search cells to make sure inmates have no more than the allotted number of books." (Amended Complaint at 6.)

Lester alleged that Michael Barrett received a letter from Kilgore on January 16, 2020, stating that a book ordered from Amazon was "censored" because it contained too much color and could have been used to hide drugs among other

things. (Amended Complaint at 6.) Lester said that Jail inmates are allowed to have 10 full-color photographs mailed in by their family and friends.

Lester further alleged:

> Obtaining reading material in the Jail is a frustrating process. Every two weeks Lester has to put in for a library slip to request books from the bookroom. Usually the books he receives are old and worn out. These books normally have missing pages and are rarely the books he requested or even the types he requested. The Defendants may state that his family may donate books to the Jail, but there is no guarantee he will receive them, which has been confirmed by Jail staff.

(Amended Complaint at 9.) Lester further alleged that the defendants cannot show there is a reasonably related, legitimate penological interest for this policy.

Lester stated that the book on the Qabalah, which he was not allowed to receive, would have instructed him "in the mystical practice he believes is central to an esoteric form of Judeo-Christianity he practices." (Amended Complaint at 9.) Lester stated:

> For centuries, Judaic and Christian mystics have written a plethora of Qabalistic materials, one leading to another as there is no single authority on the subject. The Qabalah/Cabala/Kabbalalah teaches among other things, a meditative state designed to give the seeker a direct divine communication with God. The way Qabalah suggest the seeker (Lester) to do this is through acts of harmony with the universe and higher awareness. One aspect is through the Tree of Life, a tool that enables us to explore all aspects of our inner and outer selves.

(Amended Complaint at 9-10.) Lester alleged that the material contained in the book he was not allowed was the only source he had for religious instruction. As a result

of the defendants' policies and actions, Lester said, they have forced him to abandon one of the precepts of his religious beliefs. Lester did not identify this precept. Lester said that the defendants offered him no alternative means to obtain Qabalah books for his religious instruction. He said that he had exhausted all available avenues at the Jail to obtain information about Qabalah practices. Lester alleged that the Jail's regulation placed a substantial burden on the free exercise of his religion, an exercise that he believes is essential for his salvation. Lester alleged that the defendants' actions violated his due process rights and prohibited the free exercise of his religious beliefs. (Amended Complaint at 10.)

Lester alleged that the Jail generally rejects publications mailed to its inmates, except for those offered by the Human Rights Defense Center, even though Clear knew that at least a dozen other jails in Virginia permitted their inmates to order books and magazines. Lester alleged that thousands of correctional facilities in the United States allow incarcerated persons access to books and magazines. Lester alleged that he never observed Jail staff enforcing a maximum for the publications that were allowed to be sent to inmates. He also stated that there was no limit on the amount of legal papers an inmate could have in his cell, and he never saw Jail staff enforce any limit on the amount of legal papers an inmate could have in his cell. Lester alleged that it would be easier for Jail staff to provide mail and publications such as magazines to the inmates than to confiscate them. He stated that the defendants' policy was an exaggerated response to prison concerns.

Lester alleged that the Jail is a "municipality, a unit of local government organized and existing under the laws of the Commonwealth of Virginia." He said that the Jail operated four "detention facilities in Virginia, in the cities of Abingdon, Duffield, Haysi, and Tazewell…." (Amended Complaint at 5.) He said the Jail was responsible for adopting and implementing mail policies and publication policies for

the inmates for the four facilities. Lester alleged that Clear is the Superintendent of the Jail and is employed by and is an agent of the Jail. He alleged that Clear is responsible for overseeing the management and operations of the Jail's facilities and for hiring, screening, training, returning, supervising, disciplining and controlling the personnel of the Jail's facilities who interpret and apply the mail policy and publication policy. As Superintendent, Lester alleged, Clear is the final policy maker for the Jail with respect to the operations of all the Jail's facilities, including the policies governing incoming mail and publications for inmates.

Lester alleged that Kilgore is the Major, the Jail Administrator of the Jail's Abingdon facility, and is employed by and is an agent of the Jail. Lester alleged that Kilgore is the Chief of Security and is responsible for reviewing, allowing or disallowing incoming mail and publications to inmates. He alleged that Kilgore's review is final, and there is no disinterested party above him to which to appeal Kilgore's "censorship decisions." (Amended Complaint at 5.)

Clear and Kilgore are sued in their individual and official capacities. Lester alleges that the actions of the defendants were taken under the authority and color of state law. He alleged that the defendants' actions were motivated by malicious intent and were committed under color of state law with reckless indifference to his rights. He alleged that the defendants' conduct was objectively unreasonable and undertaken recklessly, intentionally, willfully and with malice and deliberate indifference to Lester's rights. (Amended Complaint at 14.) Lester alleged that the defendants' unconstitutional policies and practices were causing him irreparable harm and that he had no adequate remedy at law. He stated that he had exhausted all administrative remedies that were available to him. He stated that there was no grievance process at the Jail to allow him to access an official to review or override Kilgore's "censorship." (Amended Complaint at 12.) He alleged that Kilgore's

-8-

review was final with no process for Lester to seek review through the Jail's grievance procedure.

Lester alleged that the defendants' policy and actions violated his right to due process under the Fourteenth Amendment, in that he did not receive adequate notice and an opportunity to object to or appeal the defendants' decision to censor and prevent mail and publications from reaching him. Lester also alleged that the defendants' acts violated his right to freely exercise his religious beliefs under the First Amendment. In particular, Lester said that there was no reasonable, legitimate penological interest to censor a book about Qabalah, a religious practice that he held as a sincere belief. He said that the defendants' policies place a substantial burden on his ability to freely exercise his religious beliefs and that they offered him no alternative means to obtain such publications.

In support of the Motion, the defendants have provided the Affidavit of Jeannie Patrick, (Docket Item No. 84-1) ("Patrick's Affidavit"). According to Patrick, who works as the Administrative Lieutenant for the Jail, the Jail has an Inmate Grievance Procedure, which is set out in the Inmate Handbook. The Inmate Handbook was attached to Patrick's Affidavit. The section on the Inmate Grievance Procedure states:

> … There are four steps in filing a grievance:
> 1.    You must make a good faith attempt to resolve the issue through informal channels by use of a Request Form or Medical Request Form which are located on the Kiosk, where available.
> 2.    You may file a grievance upon dissatisfaction in the answer to the request form **within 7 days of the occurrence.** A grievance may be submitted on the Kiosk where available. If the Kiosk is not accessible, the inmate may be given a grievance form. All prerequisites of the grievance procedure must be exhausted prior to filing the grievance. The inmate shall place the grievance in the designated area for outgoing

mail. If the issue is an emergency, it may be forwarded to the Shift Commander. If the Shift Commander finds the grievance to not be an emergency, then he/she will indicate said finding and forward[] [it] to the Grievance Officer.

3.     The validity of the grievance will be reviewed to determine if it meets the definition of a grievance and if proper informal resolution attempts have been made. If it is not valid, it will be returned to you **within nine (9) days of receipt** stating the reason it is not valid. If your grievance is valid, **there shall be a written finding returned to you for every submitted grievance form within nine (9) days of receipt.**

4.     When you receive a response to a grievance and [are] not satisfied, you may appeal the result, in writing, **within 7 days of receipt of the response**, to the Chief of Security, who will process the appeal.

(Docket Item 84-2 at 27-28) (emphasis in original).

According to Patrick, all inmates are oriented to the grievance procedures in the Inmate Handbook upon booking at any Jail facility. Patrick stated that Lester had been incarcerated 10 separate times at the Jail since 2005. Patrick said Lester routinely used the grievance procedures throughout his confinement at the Jail. In fact, Patrick said that Lester was specifically apprised of the inmate grievance system on October 7, 2019, in response to an October 6, 2019, inquiry. A printout of this inquiry and response was provide to the court. (Docket Item No. 84-3.)

Patrick stated that Lester submitted a Request Form regarding a rejected book on January 14, 2020. The Request Form indicated that Lester was placed on notice that the book was rejected on January 13, 2020. Patrick said that Lester did file a grievance regarding the rejected book, but it was not timely filed within seven days of the occurrence because it was filed on January 21, 2020. (Docket Item No. 84-4.) Patrick said that, based on a review of Lester's use of the administrative remedies procedures, she could not find that Lester had filed any timely grievance addressing any of the other issues raised in this case.

Patrick also stated that Lester was caught and charged with a rules violation on December 18, 2019, for using paper to pass what was believed to be drug material to other inmates. Lester did not contest the rule violation. Patrick stated that drugs are one of the biggest security concerns for the Jail and that the most prevalent source of drugs is through inmate mail.

Lester's response to the Motion is not sworn or made under penalty of perjury. Attached to his response is the Declaration of Suzanne Lester, his mother. (Docket Item No. 88-1 at 42.) Suzanne Lester stated that sometime "shortly before April 27, 2020," she mailed Lester a copy of the Virginia Department of Corrections Operating Procedure Incoming Publications 803.2. She stated that she mailed the Operating Procedure, again, later to Lester. This Operating Procedure was attached to her declaration.

Lester also attached a copy of an April 21, 2017, Affidavit from Stephen Clear, filed in another case in this court. (Docket Item No. 88-1 at 86-90.) In this Affidavit, Clear stated that, because of overcrowding and safety concerns, beginning March 1, 2015, the Jail no longer accepted personal material for inmates from outside publishers. According to Clear, the policy was amended on June 1, 2016, to allow books to be ordered from a publishing company on a case-by-case basis, upon approval from the Jail Administrator or designee.

Lester also attached the Declaration of Lucas Davis. (Docket Item No. 88-1 at 93-94.) According to Davis, he wrote Kilgore sometime before December 23, 2019, inquiring about the Jail's procedure regarding obtaining books. Davis said that he attached Kilgore's December 23, 2019, response. Kilgore's response stated that the requested books would come in, and if they posed no security issues, he would be allowed to have them. Kilgore further stated that Davis's cell would be searched

to make sure he had no more than five books, which is the maximum allotted number. If he had more than five, he would have to either donate unwanted books to the book room or send them out to a family member at his own cost.

Lester also attached the Declaration of Michael Barrett. (Docket Item No. 88-1 at 96-98.) Barrett stated that, as a Jail inmate, he had two books ordered from Amazon rejected by Kilgore sometime before January 16, 2020. Barrett said that he sent Kilgore a letter grieving the rejection of the books. Kilgore responded that the books were rejected because they contained too much color and could be used to hide drugs or for tattoo stencils. Kilgore also said that one of the books was not allowed because it was hard backed. Kilgore also said the Jail was reviewing its policy and, when it was completed, the Jail would advise its inmates. Barrett stated that Kilgore gave him no process for challenging the rejection of his books. He stated that there was no preapproved list of the types of books that may be ordered from publishers and no written list of criteria for determining whether a book would be approved. There also was no posted list of approved mail order vendors or publishers. Barrett stated, as a Jail inmate, he was not allowed to visit the Jail's book room and had not been given a list of books contained in the book room.

Lester also provided a Declaration. (Docket Item No. 88-1 at 103.) In this Declaration, Lester stated that, since he had been at the Jail, he had not observed any security or safety issues caused by incarcerated persons receiving reading material. Lester stated that the Jail's Chaplain, on February 3, 2020, came to his cell to deliver two papers.[4] Lester said the Chaplain told him that his family could donate Qabalah books to the Jail's book room, but he could not "promise" that Lester would ever get them. The Chaplain also said that he did not have any books on Qabalah. Lester

---

[4] Lester's Declaration stated that these papers were attached at Exhibit 2, but they were not attached to the Declaration.

stated that he told the Chaplain the practice of Qabalah was essential for his salvation and that he practiced Qabalah before his incarceration.

Lester provided a second Declaration. (Docket Item No. 88-2 at 12-14.) Lester stated that he had tried "many times" to obtain Qabalah reading materials while an inmate at the Jail. Lester stated that he sent multiple requests to the facility book room and to the Chaplain asking for any Qabalah material. He said that none of his requests ever resulted in his receiving any Qabalah material. Lester said that he also requested material published by the Theosophical Society and received none.

Lester said his requests to the book room rarely were granted. He said that the books from the book room were old and normally had missing pages. He said that he was never allowed to visit the book room, and he never received a list of books in the book room. Lester said that he had several books and pieces of mail rejected but the defendants never offered him any way to have the rejected material reviewed.

Lester also stated:

I am a Judeo-Christian. I practice Qabalah as part of my religion. I have practiced Qabalah for many years before I was in the custody of the Defendants. I believe that practice of Qabalah helps me to become closer to God. Such practice also helps me better understand the Holy Bible and I believe the practice is essential or the salvation of my soul. The Defendants rejected/censored a Qabalah book called The Mystical Qabalah by Dion Fortune. I have had a copy of this book for many years for Qabalah instruction. Fortune's book is one of the go to books for Qabalah practice. When I entered the VDOC I ordered and received the book with no problems. I read and practice Qabalah from this book almost daily. Practice of Qabalah is vast and complicated, because the Defendants denied me access to any Qabalah material I had to do without any information to its practice. As a result I felt distance to my God.

(Docket Item No. 88-2 at 13) (emphasis in original).

In this Declaration, Lester also stated that he purchased hundreds or maybe thousands of pages of case files from the facility counselor, which he stored in his cell at the Jail. He said that staff members did not enforce any limit on such papers. He also said that staff members did not enforce any limit on the number of PLN magazines he could have in his cell.

In this Declaration, Lester also claimed that he had exhausted all of the grievance procedures that were available to him, but he did not state when or how, nor did he state that anyone at the Jail interfered with or prevented him from seeking his administrative remedies. Lester stated that Patrick never told him that his grievance was not valid because it was not timely filed until he read it in her affidavit. Lester stated that when the defendants rejected/censored his books and mail, they never provided him with any policy on which they relied. When he requested a copy of the policies, Lester said he was told he would need a court-ordered subpoena to get them.

Lester stated that other inmates in his Jail pod received color pamphlets from the Theosophical Society. He said that he received books and other materials that had colored pages while he was an inmate at the Jail.

Lester also attached numerous documents to this Declaration, including what appear to be discovery responses from the defendants, but which do not contain the case number of this case, (No. 88-2 at 16-27); an undated letter from The Theosophical Book Gift Institute, (Docket Item No. 88-2 at 29); a December 23, 2020, letter from Lester to Clear, (Docket Item No. 88-2 at 30); a December 21,

2020, letter from Lester to Kilgore, (Docket Item No. 88-2 at 31); various informal requests and grievances, (Docket Item No. 88-2 at 32-35);[5] a January 15, 2021, letter from Lester to Clear, (Docket Item No. 88-2 at 36); Jail job descriptions, (Docket Item No. 88-2 at 38-44); various uncertified copies of records Lester claims are from Case No. 1:18cv13, (Docket Item No. 88-2 at 47-49); various uncertified copies of records Lester claims are from Case No. 5:15cv61, (Docket Item No. 88-2 at 50-54); and what appears to be the Jail's Inmate Handbook, (Docket Item No. 88-2 at 56-84).

## II. Analysis

In their Motion, the defendants argue that summary judgment should be entered in their favor because there is no genuine dispute of fact, Lester failed to exhaust his administrative remedies, there was no violation of Lester's First or Fourteenth Amendment rights, and they were protected by qualified immunity. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the

---

[5] These materials include a December 31, 2020, request and grievance and grievance appeal concerning a rejected book mailed to Lester from the Theosophical Society sometime before December 9, 2020. (Docket Item No. 88-2 at 32-35.) Lester, however, did not raise the rejection of this book as a basis for his claims contained in his Amended Complaint.

facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

In this case, Lester claims that his First and Fourteenth Amendment rights to freely exercise his religion and to due process were violated by the defendants' policy, implemented starting March 1, 2015, that no longer allowed Jail inmates to receive personal materials from outside publishers. In particular, Lester claims that his First Amendment rights to freely exercise his religion and to free speech were violated by Kilgore's decision to reject his access to a book about Qabalah. Lester alleged that the book was confiscated/seized by Jail staff on January 13, 2020, and he received an "Inmate Mail Notice Form" telling him only that he had received a "rejected book per Major Kilgore." Lester also claims that his request to receive a subscription to a magazine about home theater products, *Sound and Vision*, was denied by Kilgore, who stated only, "the book is not considered Legal, Religious, or Educational with workbooks involved to further your education. … [y]ou can receive the types of reading material that you are now requesting from our bookroom." (Amended Complaint at 7-8.) Lester alleged that, on April 27, 2020, he received two more Inmate Notice Forms stating "[r]ejected [l]etters" for letters from

his mother that contained the VDOC's Operating Procedures regarding incoming publications. Lester also alleged that, on May 15, 2020, he received another Inmate Notice Form stating "[r]ejected [l]etters with pamphlets." The rejected letter was from the Theosophical Society.

As stated above, the defendants argue that summary judgment should be entered in their favor on Lester's claims because he failed to exhaust his administrative remedies. The Prison Litigation Reform Act of 1995, ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C.A. § 1997e(a) (West 2012). It provides as follows: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). Exhaustion is mandatory under § 1997e(a), and courts have no discretion to waive the requirement. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007). A prisoner must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734). The Supreme Court has instructed that the PLRA "requires proper exhaustion." *Woodford*, 548 U.S. at 93. Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. *See Woodford*, 548 U.S. at 90.

The defendants, through Patrick's Affidavit, have offered evidence that the Jail has an Inmate Grievance Procedure, which is set out in the Inmate Handbook. This grievance procedure requires an inmate to first attempt to informally resolve his complaint. If that does not resolve the issue, the inmate is required to file a grievance regarding the issue within seven days of the occurrence. The defendants also offered evidence through Patrick's Affidavit that Lester filed only one grievance regarding any of the issues raised in this case, and that grievance, which addressed the rejection of the book about Qabalah on January 13, 2020, was rejected because it was not timely filed within seven days of the occurrence.

Once the defendants in a prisoner case have presented evidence that a plaintiff did not exhaust his administrative remedies prior to filing suit, the plaintiff must come forward with evidence showing that he did exhaust or that administrative remedies were not available to him. Lester has done neither. Instead, Lester, in his Declaration, made the blanket assertion that he had exhausted all of the grievance procedures that were available to him, but he did not state when or how. He has provided no evidence that he filed any grievance concerning the rejection or return of any other mailing to him which was a basis of his claims other than the one book about Qabalah. Lester has provided no evidence that he filed any grievance regarding the rejection of his request to receive the *Sound and Vision* magazine. Lester has provided no evidence that he filed any grievance regarding the rejected letters from his mother or the Theosophical Society. Lester also has provided no evidence that anyone associated with the Jail prevented him from using the Jail's Inmate Grievance Procedure or that the Jail's Inmate Grievance Procedure was otherwise unavailable to him.

In light of the evidence presented by the defendants, Lester cannot defeat the entry of summary judgment by simply alleging that he exhausted all available

remedies without providing evidence that he had done so. *See Anderson*, 477 U.S. at 256-57.

Therefore, I find that there is no genuine dispute of material fact, and the defendants are entitled to summary judgment as a matter of law on Lester's claims because Lester did not fully exhaust his administrative remedies prior to filing suit. I do not address the defendants' additional arguments.

An appropriate Order will be entered.

**ENTERED**: December 8, 2021.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-19-